## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**GWENDOLYN SOBOTKER**
3343 Country Club Village Lane
Apartment C
Peachtree Corners, Georgia  30092

       *Plaintiff*

    v.

**JOHNSON & JOHNSON**
One Johnson & Johnson Plaza
New Brunswick, NJ 08933

Serve: Registered Agent
One Johnson & Johnson Plaza
New Brunswick, NJ 08933

and

**JOHNSON & JOHNSON CONSUMER,
INC. f/k/a JOHNSON & JOHNSON
CONSUMER COMPANIES, INC.**
One Johnson & Johnson Plaza
New Brunswick, NJ 08933

Serve: Registered Agent
One Johnson & Johnson Plaza
New Brunswick, NJ 08933

and

**IMERYS TALC AMERICA, INC. f/k/a
LUZENAC AMERICA, INC.**
1732 North First Street, Suite 450
San Jose, CA 95112

Serve: Corporation Trust Company
1209 Orange Street
Wilmington, DE 19801

and

Case No. __1:18-cv-723_____

**JURY TRIAL DEMANDED**

**PERSONAL CARE PRODUCTS COUNCIL, f/k/a COSMETIC, TOILETRY, AND FRAGRANCE ASSOCIATION**
1620 L Street, NW, Suite 1200
Washington, DC 20036

Serve: Thomas Myers, Registered Agent
1620 L Street, NW, Suite 1200
Washington, DC 20036

*Defendants*

## COMPLAINT

COMES NOW Plaintiff Gwendolyn Sobotker, by and through her undersigned counsel, and for her cause of action against Defendants Johnson & Johnson, Johnson & Johnson Consumer, Inc. f/k/a Johnson & Johnson Consumer Companies, Inc., Imerys Talc America, Inc., f/k/a Luzenac America, Inc., and Personal Care Products Council, f/k/a Cosmetic, Toiletry, and Fragrance Association, states the following:

## INTRODUCTION

1.      This action arises out of the development of ovarian cancer by Gwendolyn Sobotker, as a direct and proximate result of using Johnson's Baby Powder and Shower to Shower powder (hereinafter "the PRODUCTS"), two talc-based products, in the perineal area.

## PARTIES, JURISDICTION, and VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy as to Plaintiff exceeds $75,000, exclusive of interest and costs, and because Defendants are incorporated and have their principal places of business in states other than the state in which the named Plaintiff resides.

2

3.     Venue of this case is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(b)(1) because all Defendants are residents of this District for the purposes of venue.

4.     Further, venue of this case is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

5.     At all times pertinent hereto, Plaintiff Gwendolyn Sobotker was and is an adult and citizen of the States of New York and Georgia.

6.     Defendant Johnson & Johnson is a New Jersey corporation with its principal place of business in the State of New Jersey. At all pertinent times, Johnson & Johnson was engaged in the business of manufacturing, marketing, testing, promoting, selling, and/or distributing the PRODUCTS. At all pertinent times, Johnson & Johnson regularly transacted, solicited, and conducted business in the District of Columbia, including the marketing, promoting, selling, and/or distribution of the PRODUCTS.

7.     Defendant Johnson & Johnson Consumer, Inc. is a New Jersey corporation with its principal place of business in the State of New Jersey. At all pertinent times, Johnson & Johnson Consumer, Inc. was engaged in the business of manufacturing, marketing, testing, promoting, selling, and/or distributing the PRODUCTS. At all pertinent times, Johnson & Johnson Consumer, Inc. regularly transacted, solicited, and conducted business in the District of Columbia, including the marketing, promoting, selling, and/or distribution of the PRODUCTS.

8.     Defendants Johnson & Johnson and Johnson & Johnson Consumer, Inc. have, at all pertinent times, conducted continuous and systematic business in the District of Columbia through their membership in PCPC and participation in the TIPTF, among other activities, and by placing their PRODUCTS in the stream of commerce with the knowledge and intent that they

be sold in the District of Columbia and be consumed by District of Columbia citizens and residents.

9.       At all pertinent times, Defendant Johnson & Johnson Consumer, Inc. has been a wholly owned subsidiary of Defendant Johnson & Johnson, under the complete dominion and control of Defendant Johnson & Johnson, and the agent and alter ego of Defendant Johnson & Johnson.   Hereinafter, unless otherwise delineated, these two entities shall be collectively referred to as the "Johnson & Johnson Defendants."

10.       Defendant Imerys Talc America, Inc., f/k/a Luzenac America, Inc. ("Imerys Talc") is a Delaware corporation with its principal place of business in the State of California. At all pertinent times, Imerys Talc has maintained a registered agent in the District of Columbia. At all pertinent times, Imerys Talc has been in the business of mining and distributing talcum powder for use in talcum powder based products, including the PRODUCTS. Imerys Talc is the successor or continuation of Luzenac America, Inc. and Imerys Talc is legally responsible for all liabilities incurred when it was known as Luzenac America, Inc.

11.       Defendant Imerys Talc has, at all pertinent times, conducted continuous and systematic business in the District of Columbia through their membership in PCPC and participation in the TIPTF, among other activities.

12.       Defendant Personal Care Product Council ("PCPC"), f/k/a Cosmetic, Toiletry, and Fragrance Association ("CTFA") is a corporation organized under the laws of the District of Columbia, with its principal place of business in the District of Columbia.  PCPC is the successor or continuation of CTFA, and PCPC is legally responsible for all liabilities incurred when it was known as CTFA. At all pertinent times, PCPC was and is the national trade association that

4

represents companies in the personal care and cosmetics industry, including the Johnson & Johnson Defendants and Imerys Talc.

## ALLEGATIONS COMMON TO ALL COUNTS

13.    Talc is a magnesium trisilicate and is mined from the earth. Talc is an organic mineral. Imerys Talc mined the talc contained in the PRODUCTS.

14.    Talc is the main substance in talcum powders.   The Johnson & Johnson Defendants manufactured the PRODUCTS. The PRODUCTS are composed almost entirely of talc.

15.    At all pertinent times, a feasible alternative to the PRODUCTS has existed. Cornstarch is an organic carbohydrate that is quickly broken down by the body with no known health effects.  Cornstarch powders have been sold and marketed for the same uses with nearly the same effectiveness.

16.    Imerys Talc[1] has continually advertised and marketed talc as safe for human use.

17.    Imerys Talc supplies customers with material safety data sheets for talc.  These material safety data sheets are supposed to convey adequate health and warning information to its customers.

18.    Historically, "Johnson's Baby Powder" has been a symbol of freshness, cleanliness, and purity.  During the time in question, the Johnson & Johnson Defendants advertised and marketed this product as the beacon of "freshness" and "comfort," eliminating friction on the skin, absorbing "excess wetness," helping to keep skin feeling dry and comfortable, and "clinically proven gentle and mild."  The Johnson & Johnson Defendants compelled women through advertisements to dust themselves with this product to mask odor.

---

[1] All allegations regarding actions taken by Imerys Talc include actions taken while that entity was known as Luzenac America, Inc.

The bottle of "Johnson's Baby Powder" specifically targets women by stating, "For you, use every day to help feel soft, fresh, and comfortable."

19.     During the time in question, the Johnson & Johnson Defendants advertised and marketed the product "Shower to Shower" as safe for use by women as evidenced in its slogan, "A sprinkle a day keeps odor away," and through advertisement such as, "Your body perspires in more places than just under your arms.  Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day." And "SHOWER to SHOWER can be used all over your body."

20.     The Plaintiff, Gwendolyn Sobotker, used the PRODUCTS to dust her perineum for feminine hygiene purposes from approximately 1973 until 2008, with such action taking place in the State of New York.  This was an intended and foreseeable use of the PRODUCTS based on the advertising, marketing, and labeling of the PRODUCTS.

21.     In 1973, Plaintiff was living in the State of New York when she first used the PRODUCTS, and she used the PRODUCTS continuously thereafter until 2008.

22.     In or about October 2014, Plaintiff was diagnosed with ovarian cancer while living in the State of Georgia. At the time of diagnosis, Plaintiff was fifty-three (53) years old.

23.     In 1971, the first study was conducted that suggested an association between talc and ovarian cancer.  This study was conducted by Dr. W.J. Henderson and others in Cardiff, Wales.

24.     In 1982, the first epidemiologic study was performed on talc powder use in the female genital area. This study was conducted by Dr. Daniel Cramer and others.  This study found a 92% increased risk in ovarian cancer with women who reported genital talc use.  Shortly after this study was published, Dr. Bruce Semple of Johnson & Johnson came and visited Dr. Cramer about his study.  Dr. Cramer advised Dr. Semple that Johnson & Johnson should place a

warning on its talcum powders about the ovarian cancer risks so that women can make an informed decision about their health.

25.     Since 1982, there have been more than twenty-seven (27) additional epidemiologic studies providing data regarding the association of talc and ovarian cancer. Nearly all of these studies have reported an elevated risk for ovarian cancer associated with genital talc use in women.

26.     In 1993, the United States National Toxicology Program published a study on the toxicity of non-asbestiform talc and found clear evidence of carcinogenic activity.  Talc was found to be a carcinogen, with or without the presence of asbestos-like fibers.

27.     In response to the United States National Toxicology Program's study, the Cosmetic Toiletry and Fragrance Association (CTFA), now known as the PCPC, reconvened the Talc Interested Party Task Force (TIPTF). The TIPTF was originally formed by the CTFA in the 1980s to defend talc in response to the first epidemiologic studies that found an association between ovarian cancer and genital talc use. Johnson & Johnson, Inc., Johnson & Johnson Consumer Companies, Inc., and Luzenac—now known as Imerys Talc—were the primary actors and contributors to the TIPTF.  At all relevant times, Defendants coordinated the activities of the TIPTF in the District of Columbia.

28.     The stated purpose of the TIPTF was to pool financial resources of these companies in an effort to collectively defend talc use at all costs and to prevent regulation of any type over this industry.  The TIPTF hired scientists to perform biased research regarding the safety of talc, members of the TIPTF edited scientific reports of the scientists hired by this group prior to the submission of these scientific reports to governmental agencies, members of the TIPTF knowingly released false information about the safety of talc to the consuming public,

and used political and economic influence on regulatory bodies regarding talc. All of these activities have been well coordinated and planned by these companies and organizations, including the Johnson & Johnson Defendants, Imerys Talc, and PCPC, over the past four (4) decades in an effort to prevent regulation of talc and to create confusion to the consuming public about the true hazards of talc relative to ovarian cancer.

29.     At all times relevant, PCPC coordinated the defense of talc and acted as a mouthpiece for the members of the TIPTF, including the Johnson & Johnson defendants and Imerys. PCPC, funded by cosmetic-industry companies, was motivated to defend talc because its members used talc in their products. Upon information and belief and at all times relevant, PCPC's revenue has been generated through a dues system based in part on its members' annual sales. As a result, PCPC had a direct pecuniary interest in defending the safety of the PRODUCTS.

30.     Since approximately 1976, the Cosmetic Ingredient Review ("CIR") has reviewed the safety of ingredients used in the cosmetic and personal care products industry. Although Defendants have, at all relevant times, promoted CIR as an independent, regulatory body, CIR is an organization within and wholly funded by PCPC. In fact, CIR shares the same office space with PCPC and its employees are paid by PCPC.

31.     Over the years, CIR has reviewed thousands of ingredients used in the cosmetics industry, but has only found 12 ingredients to be "unsafe for use in cosmetics." In contrast, CIR has deemed approximately 1800 ingredients to be "safe as used."

32.     Even though PCPC knew of the safety concerns surrounding talc for almost three decades, the CIR did not begin to review talc until after the first lawsuit alleging a link between talc use and ovarian cancer was filed. Upon information and belief, during the CIR review

process, Defendants influenced the scientists working on the review and ultimately edited the reviews in a biased manner.  Not surprisingly, when CIR published its final report in 2015, it found talc to be safe as used in cosmetics.

33.     On November 10, 1994, the Cancer Prevention Coalition mailed a letter to then-CEO of Johnson & Johnson, Ralph Larson, informing his company that studies as far back as the 1960's ". . . show[] conclusively that the frequent use of talcum powder in the genital area poses a serious health risk of ovarian cancer." The letter cited a recent study by Dr. Bernard Harlow from Harvard Medical School confirming this fact and quoted a portion of the study where Dr. Harlow and his colleagues discouraged the use of talc in the female genital area.  The letter further stated that 14,000 women a year die from ovarian cancer and that this type of cancer is very difficult to detect and has a low survival rate.  The letter concluded by requesting that Johnson & Johnson withdraw talc products from the market because of the alternative of cornstarch powders, or at a minimum, place warning information on its talc-based body powders about the ovarian cancer risk they pose.

34.     In 1996, the condom industry stopped dusting its condoms with talc due to the health concerns of ovarian cancer.

35.     In February of 2006, the International Association for Research on Cancer ("IARC"), part of the World Health Organization, published a paper whereby they classified perineal use of talc-based body powder as a "Group 2B" human carcinogen.  IARC, which is universally accepted as the international authority on cancer issues, concluded that studies from around the world consistently found an increased risk in ovarian cancer in women from perineal use of talc.  IARC found that between 16-52% of women in the world were using talc to dust their perineum and found an increased risk of ovarian cancer in women talc users ranging from

30%-60%.  IARC concluded with this Evaluation: "There is limited evidence in humans for the carcinogenicity of perineal use of talc-based body powder." By definition, "limited evidence of carcinogenicity" means "a positive association has been observed between exposure to the agent and cancer for which a causal interpretation is considered by the Working Group to be credible, but chance, bias or confounding could not be ruled out with reasonable confidence."

36.     In approximately 2006, the Canadian government under The Hazardous Products Act and associated Controlled Products Regulations classified talc as a "D2A," "very toxic," "cancer causing" substance under its Workplace Hazardous Materials Information System (WHMIS).  Asbestos is also classified as "D2A."

37.     In 2006, Imerys Talc began placing a warning on its Material Safety Data Sheets (MSDS) it provided to the Johnson & Johnson Defendants regarding the talc it sold to them to be used in the PRODUCTS.  These MSDSs not only provided the warning information about the IARC classification but also included warning information regarding "States Rights to Know" and warning information about the Canadian Government's "D2A" classification of talc as well.

38.     In 2008, the Cancer Prevention Coalition submitted a "Petition Seeking a Cancer Warning on Cosmetic Talc Products" to the FDA.  The petition requested that the FDA immediately require cosmetic talcum powder products to bear labels with a prominent warning that frequent talc application in the female genital area is responsible for major risks of ovarian cancer.

39.     In 2013, Cancer Prevention Research published a study that showed that women who used talcum powder in their groin area had a 20 to 30 percent greater risk of developing ovarian cancer than women who did not use talc products in that area.

40.     The Gilda Radner Familial Ovarian Cancer Registry, Roswell Park Center Institute, and the Department of Gynecologic Oncology University of Vermont publish a pamphlet entitled, "Myths & Facts about ovarian cancer: What you need to know." In this pamphlet, under "known" risk factors for ovarian cancer, it lists: "Use of Talc (Baby Powder) in the Genital Area."

41.     The Defendants had a duty to know and warn about the hazards associated with the use of the PRODUCTS.

42.     The Defendants failed to inform its customers and end users of the PRODUCTS of a known catastrophic health hazard associated with the use of its products.

43.     In addition, the Defendants procured and disseminated false, misleading, and biased information regarding the safety of the PRODUCTS to the public and used influence over governmental and regulatory bodies regarding talc.

44.     As a direct and proximate result of the Defendants' calculated and reprehensible conduct, the Plaintiff developed ovarian cancer, which required surgeries and treatments, and was otherwise injured in a personal and pecuniary nature.

## FEDERAL STANDARDS AND REQUIREMENTS

45.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

46.     At all relevant times, Defendants had the obligation to comply with federal standards and regulations in the manufacture, design, marketing, branding, labeling, distribution, and sale of the PRODUCTS.

47.     Defendants, each individually, *in solido*, and/or jointly, violated the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §301, *et seq.*

48.     Defendants have or may have failed to comply with federal standards and requirements governing the manufacture, design, marketing, branding, and sale of the PRODUCTS including, but not limited to, the following violations of sections and subsections of the United States Code and the Code of Federal Regulations:

a.     The PRODUCTS are adulterated pursuant in violation of 21 U.S.C. § 361 because, among other things, they contain a poisonous or deleterious substance which may render them injurious to users under the conditions of use prescribed in the labeling thereof, or under such conditions of use as are customary or usual.

b.     The PRODUCTS are misbranded in violation of 21 U.S.C. § 362 because, among other things, their labeling is false or misleading.

c.     The PRODUCTS are misbranded in violation 21 U.S.C. § 362 because words, statements, or other information required by or under authority of 21 U.S.C. § 362 are not prominently placed thereon with such conspicuousness and in such terms as to render them likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

d.     The PRODUCTS are misbranded in violation of 21 C.F.R. § 701.1 because they contain false or misleading representations that they are safe for daily application to all parts of the female body.

e.     The PRODUCTS do not bear a warning statement, in violation of 21 C.F.R. § 740.1, to prevent a health hazard that may be associated with the PRODUCTS, namely that the PRODUCTS may cause ovarian cancer or a heightened risk of ovarian cancer when applied to the perineal area.

f.      The PRODUCTS do not prominently and conspicuously bear a warning statement, in violation of 21 C.F.R. § 740.2, as to the risk of ovarian cancer caused by the use of the PRODUCTS when applied to the perineal area, in such terms and design that it is likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

g.      The PRODUCTS, in violation of 21 C.F.R. § 740.10, do not conspicuously state on their principal display panel that the safety of the PRODUCTS have not been determined and/or that the safety of the PRODUCTS' principal ingredients have not been determined.

## COUNT I – VIOLATION OF THE D.C. CONSUMER PROTECTION PROCEDURES ACT, D.C. CODE § 28-3901 ET SEQ.
### (Against the Johnson & Johnson Defendants)

49.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

50.     Plaintiff is a "consumer" as defined in D.C. Code § 28-3901(2), in that Plaintiff purchased or received, other than for purposes of resale, goods from the Johnson & Johnson Defendants.

51.     The Johnson & Johnson Defendants are "merchants" as defined in D.C. Code § 28-3901(3), in that they sold, either directly or indirectly, consumer goods to Plaintiff in the ordinary course of business.

52.     The Johnson & Johnson Defendants' actions in marketing, advertising, and otherwise making public representations about the PRODUCTS constitute "trade practices" as defined by D.C. Code § 28-3901(6), as they were actions that created, altered, repaired,

furnished, made available, provided information about, or, directly or indirectly, solicited or offered for or effectuated a sale, lease, or transfer of consumer goods.

53.     At all relevant times, the Johnson & Johnson Defendants knew or should have known of the unreasonably dangerous and carcinogenic nature of talc, especially when used in a woman's perineal region.

54.     At all relevant times, the Johnson & Johnson Defendants, through their labeling and marketing of the PRODUCTS, intentionally misrepresented material facts in order to mislead consumers that the PRODUCTS were safe for use in the female perineal area and induce consumers to purchase its PRODUCTS. The Johnson & Johnson Defendants, through their labeling, advertisements, and public representations associated with the PRODUCTS, since the PRODUCTS' introduction into the marketplace, have stated that the PRODUCTS were safe for use all over the body, including the female perineal area.  The Johnson & Johnson Defendants' misrepresentations constitute unlawful trade practices under D.C. Code §§ 28-3904(a), (d), and (e).

55.     The labeling and advertisements for the PRODUCTS include, but are not limited to, the following statements: "For you, use every day to help feel soft, fresh, and comfortable;" "A sprinkle a day keeps the odor away;" "Your body perspires in more places than just under your arms;" "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day;" and "SHOWER to SHOWER can be used all over your body."

56.     In particular, the Johnson & Johnson Defendants advertised the product SHOWER to SHOWER to be applied "all over," and suggested that women use it to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction. Apply after a bikini wax to help reduce irritation and discomfort."

57.    At all relevant times, the Johnson & Johnson Defendants misled consumers by failing to state material facts about the PRODUCTS.  In particular, the Johnson & Johnson Defendants failed to disclose to the public that the PRODUCTS were unsafe and posed serious health hazards, particularly when used in the perineal areas of women. The first study that suggested an association between talc and ovarian cancer was conducted in 1971, and studies confirming this association have been and continue to be conducted. The Johnson & Johnson Defendants were aware of the hazardous risks posed by the PRODUCTS and yet failed to inform the public of these risks through their advertisements, labeling, or other means available to them. The Johnson & Johnson Defendants' failure to state material facts about their PRODUCTS constitutes a violation of D.C. Code §28-3904(f) in that the failure to state material facts misled consumers, including the Plaintiff.

58.    At all relevant times, Plaintiff was deceived by Defendants' intentional misrepresentations and omissions, including by the orchestrated claims made on or in television commercials, advertising materials, Web sites, and on product labels and packaging regarding the usage and safety of the PRODUCTS.

59.    At all relevant times, Plaintiff acted in reasonable reliance upon the Johnson & Johnson Defendants' unlawful trade practices, and had the Johnson & Johnson Defendants not engaged in the deceptive conduct described herein, Plaintiff would not have purchased and/or received the PRODUCTS.

60.    As a direct and proximate result of the unlawful trade practices of the Johnson & Johnson Defendants, in violation of D.C. Code §28-3901, *et seq.*, Plaintiff has suffered and will continue to suffer damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against the Johnson & Johnson Defendants in a fair a reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT II – NEGLIGENCE OR WANTONNESS
### (Against Imerys Talc)

61.     Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

62.     At all relevant times, Imerys Talc mined and sold talc to the Johnson & Johnson Defendants, which it knew that Johnson & Johnson was then packaging and selling to consumers as the PRODUCTS and that consumers of the PRODUCTS were using it to powder their perineal regions.

63.     At all relevant times, Imerys Talc had a duty to act with reasonable care in the design, development, marketing, labeling, manufacturing, formulating, testing, monitoring, and sale of the PRODUCTS.

64.     At all relevant times, Imerys Talc knew or should have known of the unreasonably dangerous and carcinogenic nature of the talc it was selling to the Johnson & Johnson Defendants, especially when used in a woman's perineal regions, and it knew or should have known that the Johnson & Johnson Defendants did not warn its consumers of that danger.

65.     At all relevant times, Imerys Talc was negligent in supplying talc to the Johnson & Johnson Defendants, when it knew or should have known that the talc would be used in the PRODUCTS, without adequately taking steps to ensure that consumers of the PRODUCTS, including Plaintiff, received material information that Imerys Talc possessed on carcinogenic properties of talc, including its risk of causing ovarian cancer.

66.     At all relevant times, Imerys Talc breached their duty of reasonable care to Plaintiff in that they negligently designed, developed, marketed, labeled, manufactured, formulated, tested, monitored, and/or sold the PRODUCTS.

67.     As a direct and proximate result of Imerys Talc's negligence, Plaintiff has suffered and will continue to suffer damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against Imerys Talc in a fair and reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT III – NEGLIGENCE OR WANTONNESS
### (Against the Johnson & Johnson Defendants)

68.     Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

69.     At all relevant times, the Johnson & Johnson Defendants manufactured, designed, formulated, marketed, tested, promoted, supplied, sold and/or distributed the PRODUCTS in the regular course of business.

70.     At all relevant times, the Johnson & Johnson Defendants had a duty to act with reasonable care in the design, development, marketing, labeling, manufacturing, formulating, testing, monitoring, distribution, and sale of the PRODUCTS.

71.     At all relevant times, the Johnson & Johnson Defendants had a duty to act with reasonable care and to warn Plaintiff of the risk, dangers, and adverse side effects of the PRODUCTS.

72.     At all relevant times, the Johnson & Johnson Defendants knew or should have known that the PRODUCTS were unreasonably dangerous and defective when used in a reasonably foreseeable manner.

73.     The Johnson & Johnson Defendants breached their duty to Plaintiff and were otherwise negligent in the design, development, marketing, labeling, manufacturing, formulating, testing, monitoring, distribution, and/or sale of the PRODUCTS utilized by Plaintiff, which were inherently dangerous and defective, and unfit and unsafe for their intended and reasonably foreseeable uses.

74.     The Johnson & Johnson Defendants were further negligent in failing to accompany the PRODUCTS with proper warnings or adequate labeling regarding the dangerous and potentially fatal health risks associated with the use of the PRODUCTS, particularly when used in the perineal area of women, which was their intended or reasonable foreseeable use.

75.     As a direct and proximate result of the Johnson & Johnson Defendants' negligence, Plaintiff has suffered and will continue to suffer damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against the Johnson & Johnson Defendants in a fair and reasonable sum in excess of $75,000, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT IV – NEGLIGENCE OR WANTONNESS
### (Against PCPC)

76.     Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

77.     At all relevant times, PCPC was a national trade association representing the personal care and cosmetics industry of which Johnson & Johnson and Imerys Talc were active members.

78.     At all relevant times, PCPC had actual knowledge of the significant risk of ovarian cancer caused by application of the PRODUCTS to the female perineal area.

79.     At all relevant times, PCPC voluntarily undertook a duty of care to Plaintiff by promulgating standards, norms, and/or bylaws that govern, control, and/or inform the manufacturing, design, labeling, marketing, distribution, and/or branding practices of its member companies, including but not limited to the Johnson & Johnson Defendants and Imerys Talc.

80.     At all relevant times, PCPC had the means and authority to control the safety standards of the Johnson & Johnson Defendants and Imerys Talc in manufacturing, design, labeling, marketing, distribution, and/or branding the PRODUCTS.

81.     PCPC breached its duty of care to Plaintiff by negligently failing to ensure that the Johnson & Johnson Defendants and Imerys Talc complied and adhered to the PCPC standards, norms, and/or bylaws concerning the safe manufacture, design, labeling, marketing, distribution, and/or branding of the PRODUCTS, and subsequently allowing the PRODUCTS to be introduced into the stream of interstate commerce despite their significant health and safety risks of which PCPC had full knowledge.

82.     As a direct and proximate result of PCPC's negligence, the Johnson & Johnson Defendants and Imerys Talc manufactured, designed, labeled, marketed, distributed, and branded its PRODUCTS in a way that foreseeably caused a significant risk of ovarian cancer when the PRODUCTS were applied to the female perineal area.

83.     As a further direct and proximate result of PCPC's negligence, Plaintiff suffered and will continue to suffer damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against PCPC in a fair and reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT V – STRICT LIABILITY – DEFECTIVE MANUFACTURE AND DESIGN
### (Against Imerys Talc)

84.     Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

85.     Imerys Talc is liable under the theory of strict liability as set forth in the Restatement (Second) of Torts § 402A.

86.     At all relevant times, Defendant Imerys Talc was engaged in the business of mining and distributing talcum to Johnson & Johnson Defendants for use in the PRODUCTS, and they were knowingly an integral part of the overall manufacture, design, and production of the PRODUCTS and their introduction into the stream of interstate commerce.

87.     At all relevant times, the PRODUCTS were expected to and did reach Plaintiff without a substantial change in their condition.

88.     At all relevant times, the PRODUCTS were defectively and improperly manufactured and designed by Imerys Talc in that, when Imerys Talc supplied its talc product to Johnson & Johnson with full knowledge that Johnson & Johnson would use its talc in formulating the PRODUCTS and that the talc would be the primary ingredient in the PRODUCTS, the foreseeable risks of the PRODUCTS far outweighed the benefits associated with their design and formulation.

89.     At all relevant times, the PRODUCTS were defectively manufactured and designed by Imerys Talc in that their design and formulation is more dangerous than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

90.     At all relevant times, the PRODUCTS created significant risks to the health and safety of consumers that far outweigh the risks posed by other products on the market used for the same therapeutic purpose.

91.     As a direct and proximate result of the defective design and manufacture of the PRODUCTS, Plaintiff suffered and will continue to suffer damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against Imerys Talc in a fair and reasonable sum in excess of $75,000.00 together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT VI – STRICT LIABILITY – DEFECTIVE MANUFACTURE AND DESIGN
### (Against the Johnson & Johnson Defendants)

92.     Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

93.     The Johnson & Johnson Defendants are liable under the theory of strict liability as set forth in the Restatement (Second) of Torts § 402A.

94.     At all relevant times, the Johnson & Johnson Defendants were engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising, and otherwise introducing the PRODUCTS into the stream of interstate commerce, which they sold and distributed throughout the United States.

95.     At all relevant times, the PRODUCTS were expected to and did reach Plaintiff without a substantial change in condition.

96.     At all relevant times, the PRODUCTS were defectively and improperly manufactured and designed by the Johnson & Johnson Defendants in that, when the PRODUCTS left the hands of the Johnson & Johnson Defendants, the foreseeable risks of the PRODUCTS far outweighed the benefits associated with their design and formulation.

97.     At all relevant times, the PRODUCTS were defectively manufactured and designed by the Johnson & Johnson Defendants in that their design and formulation is more dangerous than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

98.     At all relevant times, the PRODUCTS created significant risks to the health and safety of consumers that far outweigh the risks posed by other products on the market used for the same therapeutic purpose.

99.     At all relevant times, a reasonable and safer alternative design existed, which could have feasibly been employed by the Johnson & Johnson Defendants to manufacture a product with the same therapeutic purpose as the PRODUCTS.  Despite knowledge of this reasonable and safer alternative design, the Johnson & Johnson Defendants failed to alter the PRODUCTS' design and formulation.  The magnitude of the danger created by the PRODUCTS far outweighs the costs associated with using an alternative, safer design.

100.    As a direct and proximate result of the defective design and manufacture of the PRODUCTS, Plaintiff has suffered and will continue to suffer damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against the Johnson & Johnson Defendants in a fair a reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT VII – STRICT LIABILITY – FAILURE TO WARN
### (Against Imerys Talc)

101.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

102.    Imerys Talc is liable under a theory of strict products liability as set forth in § 402A of the Restatement of Torts (Second).

103.    At all relevant times, Imerys Talc mined and sold talc to the Johnson & Johnson Defendants with full knowledge that the Johnson & Johnson Defendants were then packaging the talc and selling to consumers as the PRODUCTS and that consumers of the PRODUCTS were using it to powder their perineal regions.

104.    At all relevant times, by mining talc and supplying that talc to the Johnson & Johnson Defendants for use in the PRODUCTS, Imerys Talc was knowingly an integral part of the overall manufacture, design, and production of the PRODUCTS and their introduction into the stream of interstate commerce.

105.    At all relevant times, Imerys Talc knew or should have known of the unreasonably dangerous and carcinogenic nature of the talc it was selling to the Johnson & Johnson Defendants, especially when applied to a woman's perineal regions, and it knew or should have known that Johnson & Johnson was not warning its consumers of this danger.

106.    At all relevant times, Imerys Talc knew or should have known that the use of the PRODUCTS significantly increases the risk of ovarian cancer in women based upon scientific knowledge dating back until at least 1971.

107.    At all relevant times, the PRODUCTS were defective and unreasonably dangerous when used in a reasonably foreseeable manner because, despite Imerys Talc's knowledge that the PRODUCTS were carcinogenic and could lead to an increased risk of ovarian cancer, Imerys Talc failed to provide adequate warning and/or instruction to consumers, including Plaintiff, regarding the increased risk of ovarian cancer associated with the use of the PRODUCTS when applied to the perineal area.

108.    Had Plaintiff received warning or instruction regarding the increased risk of ovarian cancer associated with the PRODUCTS when applied to the perineal area, Plaintiff would not have used the PRODUCTS in this manner.

109.    Due to the absence of any warning or instruction by the Defendants as to the significant health and safety risks posed by the PRODUCTS as described herein, Plaintiff was unaware that the PRODUCTS created an increased risk of ovarian cancer, as this danger was not known to the general public.

110.    As a direct and proximate result of Imerys Talc's failure to warn Plaintiff of the increased risk of ovarian cancer associated with the PRODUCTS when applied to the perineal area, despite their actual knowledge of this material fact, Plaintiff has suffered and will continue to suffer damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against Imerys Talc in a fair a reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT VIII – STRICT LIABILITY – FAILURE TO WARN
### (Against the Johnson & Johnson Defendants)

111.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

112.    The Johnson & Johnson Defendants are liable under a theory of strict products liability as set forth in § 402A of the Restatement of Torts (Second).

113.    At all relevant times, the Johnson & Johnson Defendants were engaged in the business of manufacturing, formulating, designing, marketing, testing, promoting, selling, distributing, and otherwise introducing into the stream of interstate commerce the PRODUCTS.

114.    At all relevant times, the Johnson & Johnson Defendants knew or should have known that the use of the PRODUCTS in the female perineal area significantly increased the risk of ovarian cancer in women based upon scientific knowledge dating back until at least 1971.

115.    At all relevant times, the PRODUCTS, manufactured and supplied by the Johnson & Johnson Defendants, were defective and unreasonably dangerous because, despite the Johnson & Johnson Defendants' knowledge that its PRODUCTS were carcinogenic and could lead to an increased risk of ovarian cancer when applied to the female perineal area, a reasonably foreseeable use of the PRODUCTS, the Johnson & Johnson Defendants failed to provide adequate warning or instruction to consumers, including Plaintiff, regarding the increased risk of ovarian cancer when the PRODUCTS are applied to the female perineal area.

116.    At all relevant times, Plaintiff used the PRODUCTS to powder her perineal area, a use that was reasonably foreseeable and for which the PRODUCTS were supplied.

117.    Had Plaintiff received warning and/or instruction from the Johnson & Johnson Defendants regarding the increased risk of ovarian cancer associated with the PRODUCTS when applied to the perineal area, Plaintiff would not have used the PRODUCTS in this manner.

118.    Due to the absence of any warning or instruction by the Johnson & Johnson Defendants as to the significant health and safety risks posed by the PRODUCTS as described herein, Plaintiff was unaware that the PRODUCTS created an increased risk of ovarian cancer, as this danger was not known to the general public.

119.    As the direct and proximate result of the reasonably foreseeable use of the PRODUCTS as manufactured, formulated, marketed, tested, promoted, sold, distributed, and introduced into the stream of commerce by the Johnson & Johnson Defendants, Plaintiff suffered and will continue to suffer damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against the Johnson & Johnson Defendants in a fair a reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT IX – NEGLIGENT MISREPRESENTATION
### (Against the Johnson & Johnson Defendants)

120.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

121.    At all relevant times, the Johnson & Johnson Defendants were engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling and/or distributing the PRODUCTS.

122.    At all relevant times, the Johnson & Johnson Defendants had a duty to disclose to consumers and the public material facts about the PRODUCTS, including the material fact that application of the PRODUCTS to the female perineal area causes a significantly increased risk of ovarian cancer.

123.    Through their actions and omissions in advertising, promoting, labeling, and otherwise, Defendants made public misrepresentations of material facts to, and/or concealed material facts from, consumers like Plaintiff concerning the character, safety, and effectiveness of the PRODUCTS.

124.    At all relevant times, those misrepresentations and omissions included, but are not limited to, the following:

a.    The Johnson & Johnson Defendants labeled and advertised the PRODUCTS in the following ways, among others: "For you, use every day to help feel soft, fresh, and comfortable;" "A sprinkle a day keeps the odor away;" "Your body perspires in more places than just under your arms;" "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day; and "SHOWER to SHOWER can be used all over your body."

b.    The Johnson & Johnson Defendants advertised the product SHOWER to SHOWER to be applied "all over," and in particular, urged women to use it to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction.  Apply after a bikini wax to help reduce irritation and discomfort."

c.    The Johnson & Johnson Defendants, through the advertisements described above, among others, misrepresented to consumers, including the Plaintiff, that the PRODUCTS were safe for use all over the body, including the female perineal area.

d.    Despite actual knowledge of the health risks of the PRODUCTS, the Johnson & Johnson Defendants failed to disclose to the consumers and the

Plaintiff, through adequate warnings, representations, labeling, or otherwise, that the PRODUCTS were inherently dangerous and carcinogenic in nature, which poses serious health risks to consumers.

e.     Despite actual knowledge that the use of the PRODUCTS in the perineal area created a significantly increased risk of ovarian cancer, the Johnson & Johnson Defendants failed to disclose to consumers and the Plaintiff, through adequate warnings, representations, labeling, or otherwise, that material fact.

125.    At all relevant times, the Johnson & Johnson Defendants failed to exercise reasonable care in ascertaining or sharing information regarding the safe use of PRODUCTS, failed to disclose facts indicating that the PRODUCTS were inherently dangerous and carcinogenic in nature, and otherwise failed to exercise reasonable care in communicating the information concerning the PRODUCTS to Plaintiff and/or concealed relevant facts that were known to them.

126.    At all relevant times, Plaintiff was not aware of the falsity of the foregoing misrepresentations, nor was she aware that material facts concerning talc and the PRODUCTS had been concealed or omitted.  In reasonable reliance upon the Johnson & Johnson Defendants' misrepresentations and/or omissions, Plaintiff was induced to and did purchase the PRODUCTS and did use the PRODUCTS on her perineal area.  If the Johnson & Johnson Defendants had disclosed true and accurate material facts concerning the risks of the use of the PRODUCTS, in particular the risk of developing ovarian cancer from using the PRODUCTS in the female perineal area, Plaintiff would not have purchased and/or received the PRODUCTS and/or used the PRODUCTS in that manner.

127.     Plaintiff's reliance upon the Johnson & Johnson Defendants' misrepresentations and omissions was justified and reasonable because, among other reasons, those misrepresentations and omissions were made by individuals and entities who were in a position to know the material facts concerning the PRODUCTS and the association between the PRODUCTS and the incidence of ovarian cancer, while Plaintiff was not in a position to know these material facts, and because the Johnson & Johnson Defendants failed to warn or otherwise provide notice to the consuming public as to the risks of the PRODUCTS, thereby inducing Plaintiff to use the PRODUCTS in lieu of safer alternatives and in ways that created unreasonably dangerous risks to her health. At all relevant times, the Johnson & Johnson Defendants' corporate officers, directors, and/or managing agents knew of and ratified the acts of the Johnson & Johnson Defendants, as alleged herein.

128.     As a direct and proximate result of the Johnson & Johnson Defendants' negligent misrepresentations and/or omissions concerning the risks and benefits of the PRODUCTS, Plaintiff suffered and continues to suffer from the injuries and damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against the Johnson & Johnson Defendants in a fair a reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT X – FRAUD
### (Against the Johnson & Johnson Defendants)

129.     Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

130.    At all relevant times, the Johnson & Johnson Defendants intentionally, willfully, and/or recklessly, with the intent to deceive, misrepresented and/or concealed material facts to consumers and users, including Plaintiff.

131.    At all relevant times, the Johnson & Johnson Defendants misrepresented and/or concealed material facts concerning the PRODUCTS to consumers, including the Plaintiff, with knowledge of the falsity of their misrepresentations.

132.    At all relevant times, upon information and belief, the misrepresentations and concealments concerning the PRODUCTS made by the Johnson & Johnson Defendants include, but are not limited to the following:

a.    The Johnson & Johnson Defendants falsely labeled and advertised the PRODUCTS in the following ways, among others: "For you, use every day to help feel soft, fresh, and comfortable," "a sprinkle a day keeps the odor away," "your body perspires in more places than just under your arms," "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day," and "SHOWER to SHOWER can be used all over your body."

b.    The Johnson & Johnson Defendants falsely advertised the PRODUCT SHOWER to SHOWER to be applied "all over," and in particular, urges women to use it to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction. Apply after a bikini wax to help reduce irritation and discomfort."

c.    The Johnson & Johnson Defendants, through the advertisements described above, knowingly misrepresented to Plaintiff and the public that the PRODUCTS were safe for use all over the body, including the perineal areas of women.

d.      The Johnson & Johnson Defendants intentionally failed to disclose that talc and the associated PRODUCTS, when used in the perineal area, increase the risk of ovarian cancer.

e.      The Johnson & Johnson Defendants intentionally failed to include adequate warnings with the PRODUCTS regarding the potential and actual risks of using the PRODUCTS in the perineal area on women and the nature, scope, severity, and duration of any serious injuries resulting therefrom.

f.      Despite knowing about the carcinogenic nature of talc and its likelihood to increase the risk of ovarian cancer in women, the Johnson & Johnson Defendants falsely marketed, advertised, labeled and sold the PRODUCTS as safe for public consumption and usage, including for use by women to powder their perineal areas.

133.   At all relevant times, the Johnson & Johnson Defendants actively, knowingly, and intentionally concealed and misrepresented these material facts to the consuming public with the intent to deceive the public and Plaintiff, and with the intent that the consumers would purchase and use the PRODUCTS in the female perineal area.

134.   At all relevant times, the consuming public, including Plaintiff, would not otherwise have purchased the PRODUCTS and/or applied the PRODUCTS in the perineal area if they had been informed of the risks associated with the use of the PRODUCTS in the perineal area.

135.   At all relevant times, Plaintiff relied on the Johnson & Johnson Defendants' misrepresentations concerning the safety of the PRODUCTS when purchasing the PRODUCTS and using them in her perineal area, and her reliance was reasonable and justified.

136.    As a direct and proximate result of the Johnson & Johnson Defendant's fraudulent conduct concerning the PRODUCTS, as described herein, Plaintiff suffered and continues to suffer from the injuries and damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against the Johnson & Johnson Defendants in a fair a reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT XI – FRAUDULENT CONCEALMENT
### (Against Imerys Talc )

137.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

138.    Prior to Plaintiffs' use of the PRODUCTS and during the period in which plaintiffs actually used the PRODUCTS, Imerys Talc fraudulently suppressed material information regarding the safety and efficacy of the PRODUCTS and the availability of an alternative feasible safer design, including but not limited to, information regarding a safe use of cornstarch based products for the same purposes.    Furthermore, Imerys Talc fraudulently concealed the safety information about the use of talc, generally, and on the perineal area, specifically. Plaintiffs believe the fraudulent misrepresentations and fraudulent concealment described throughout this First Amended Master Long Form Complaint were intentional so as to maintain the sales volume of its talc.

139.    Imerys Talc intentionally concealed safety issues with talc generally in order to induce consumers, including Plaintiffs, to purchase the PRODUCTS.

140.    At the time Imerys Talc concealed the fact that the PRODUCTS were not safe as designed and marketed by the Johnson & Johnson Defendants, Imerys Talc was under a duty to

communicate this information to the general public in such a manner that the general public would appreciate the risks associated with using the PRODUCTS, generally.

141.    Plaintiffs relied upon the Defendants' false and fraudulent misrepresentations and concealments regarding the safety of the PRODUCTS.

142.    As a direct and proximate result of Imerys Talc's malicious and intentional concealment of material and information, Defendants caused or significantly contributed to Plaintiffs' injuries.

143.    Imerys Talc furthered this fraudulent concealment through a continued and systematic failure to disclose information to Plaintiffs and the public.

144.    Imerys Talc's conduct, as described in the preceding paragraphs, amounts to conduct purposely committed, which Imerys Talc must have realized was dangerous, needless and reckless, without regard to the consequences or the rights and safety of Plaintiffs.

145.    As a direct and proximate result of Imerys Talc's fraudulent concealment concerning the PRODUCTS, as described herein, Plaintiffs suffered and continue to suffer from the damages for which they are entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against Imerys Talc in a fair a reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT XII – FRAUD
### (Against PCPC)

146.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

147.    At all relevant times, PCPC intentionally, willfully, and/or recklessly, with the intent to deceive, misrepresented and/or concealed material facts to consumers and users of the PRODUCTS, including Plaintiff.

148.    At all relevant times, PCPC fraudulently misrepresented and/or concealed material facts to consumers and users of the PRODUCTS, including Plaintiff, with knowledge of the falsity of their misrepresentations.

149.    At all relevant times, upon information and belief, PCPC's conduct giving rise to fraud includes, but is not limited, to the following:

a.    PCPC formed the TIPTF, with the purpose to pool financial resources in an effort to prevent regulation of talc products, including the PRODUCTS.

b.    PCPC, through the TIPTF, hired and funded scientists to perform research regarding the safety of talc.  The TIPTF then edited the scientific reports in an effort to skew the data so that it demonstrated safety of talc and talc products and suppress data demonstrating the dangers of talc.  The TIPTF then released and disseminated this biased and intentionally misleading data to governmental agencies.

c.    PCPC, through the TIPTF, knowingly released false information about the safety of talc products to the consuming public with the intent to induce consumers, including the Plaintiff, to purchase talc products.

d.    PCPC extensively lobbied and used political and economic influence on governmental bodies in order to prevent regulation of talc products, including the PRODUCTS.   These efforts were based knowingly on false and misleading information about the safety of talc.

e.     PCPC caused to be released, published, and disseminated medical and
scientific data, literature, and reports containing information and statements
regarding the risks of ovarian cancer which PCPC knew were incorrect,
incomplete, and misleading.

150.    At all relevant times, PCPC actively, knowingly, and intentionally concealed and
misrepresented these material facts to consumers, including the Plaintiff, with the intent to
deceive the public and Plaintiff, and with the intent that consumers would purchase and use the
product in the female perineal area.

151.    The consuming public, including Plaintiff, would not have purchased the
PRODUCTS and/or applied the PRODUCTS in the perineal area if they had been informed of
the risks associated with the use of the PRODUCTS in that manner.

152.    At all relevant times, Plaintiff relied on PCPC's misrepresentations concerning
the safety of the PRODUCTS and fraudulent conduct when purchasing the PRODUCTS and
using them in her perineal area, and her reliance was reasonable and justified.

153.    As a direct and proximate result of PCPC's fraudulent conduct concerning the
PRODUCTS, as described herein, Plaintiff suffered and continues to suffer from the injuries and
damages for which she is entitled to recovery, including but not limited to compensatory
damages, consequential damages, interest, costs, and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against PCPC in a fair a reasonable sum in
excess of $75,000.00, together with costs expended herein and such further and other relief as the
Court deems just and appropriate.

<u>**COUNT XIII – BREACH OF EXPRESS WARRANTIES**</u>
<u>**(Against the Johnson & Johnson Defendants)**</u>

35

154.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

155.    The Johnson & Johnson Defendants, through their advertising and promotional materials, expressly warranted and affirmed that the PRODUCTS were safe for the uses for which they were intended and for uses which were reasonably foreseeable. The Johnson & Johnson Defendants' express warranties extended beyond delivery of the PRODUCTS and expressly warranted for future performance of the PRODUCTS. These express warranties include, but are not limited to, the following:

a.      The Johnson & Johnson Defendants advertised and labeled the PRODUCTS as safe for application all over the body, including the following: "For you, use every day to help feel soft, fresh, and comfortable;" "A sprinkle a day keeps the odor away;" "Your body perspires in more places than just under your arms;" "Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day;" and "SHOWER to SHOWER can be used all over your body."

b.      The Johnson & Johnson Defendants advertised the PRODUCT SHOWER to SHOWER to be applied around or on the perineal area.  For example, the Johnson & Johnson Defendants advertised that women should use their SHOWER to SHOWER PRODUCT to "Soothe Your Skin: Sprinkle on problem areas to soothe skin that has been irritated from friction. Apply after a bikini wax to help reduce irritation and discomfort."

c.      The Johnson & Johnson Defendants, through the advertisements as listed above, made express warranties to Plaintiff and the public that the PRODUCTS

were safe and effective when applied all over the body, including the female perineal area.

156.   At all relevant times, the Johnson & Johnson Defendants breached said express warranties in that the PRODUCTS were unsafe and ineffective for application all over the body, specifically when used in the female perineal area, because the PRODUCTS when used in this manner for which the Johnson & Johnson Defendants advertised and promoted significantly increased the risk of developing ovarian cancer among consumers.

157.   At all relevant times, the Johnson & Johnson Defendants had knowledge of the hazards and health risks posed by the PRODUCTS when applied to the perineal area.

158.   At all relevant times, the Johnson & Johnson Defendants willfully failed to disclose the defects and health risks of the PRODUCTS to Plaintiff and the consuming public.

159.   At all relevant times, in reliance upon the express warranties made by the Johnson & Johnson Defendants as set forth above, Plaintiff purchased and used the PRODUCTS in her perineal area, believing that the PRODUCTS were safe when used in this manner

160.   As a direct and proximate result the Johnson & Johnson Defendant's express warranties concerning the PRODUCTS, as described herein, Plaintiff suffered and continues to suffer from the injuries and damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against the Johnson & Johnson Defendants in a fair a reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT XIV – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Against The Johnson & Johnson Defendants)

161.     Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

162.     At the time the Johnson & Johnson Defendants manufactured, marketed, labeled, promoted, distributed and/or sold the PRODUCTS, Defendants knew of the uses for which the PRODUCTS were intended, including use by women in the perineal area, and impliedly warranted the PRODUCTS were merchantable and fit for the ordinary purposes for which they were intended.

163.     Members of the consuming public, including consumers such as Plaintiff, were intended third-party beneficiaries of the warranty.

164.     The PRODUCTS were not merchantable or fit for their ordinary purposes, because they had a propensity to lead to the serious personal injuries described herein.

165.     Plaintiff reasonably relied on the Johnson & Johnson Defendants' representations that the PRODUCTS were safe and free of defects.

166.     The Johnson & Johnson Defendants' breach of the implied warranty of merchantability was the direct and proximate cause of Plaintiffs' injuries.

167.     The Johnson & Johnson Defendants' conduct, as described above, was extreme and outrageous.   Defendants risked the lives of the consumers and users of their products, including Plaintiff, with knowledge of the safety and efficacy problems, and suppressed this knowledge from Plaintiff and the general public.   The Johnson & Johnson Defendants made conscious decisions not to redesign, relabel, warn or inform Plaintiff or the unsuspecting consuming public.   The Johnson & Johnson Defendants' outrageous conduct warrants an award of punitive damages.

168.     As a direct and proximate result of the Johnson & Johnson Defendants' implied warranties of merchantability concerning the PRODUCTS, as described herein, Plaintiff suffered and continue to suffer from the injuries and damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against the Johnson & Johnson Defendants in a fair a reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

### COUNT XV– BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE (Against The Johnson & Johnson Defendants)

169.     Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

170.     The Johnson & Johnson Defendants manufactured, supplied and sold the PRODUCTS with an implied warranty that they were fit for the particular purpose for which they were warranted.

171.     Members of the consuming public, including Plaintiff, were the intended third-party beneficiary of the warranty.

172.     The PRODUCTS were not fit for the particular purpose for which they were warranted without serious risk of personal injury, which risk is much higher than other products designed to perform the same function.

173.     Plaintiff reasonably relied on the Johnson & Johnson Defendants' representations that the PRODUCTS were safe and effective for use by women in the perineal area.

174.    The Johnson & Johnson Defendants' breach of the implied warranty of fitness for a particular purpose was the direct and proximate cause of Plaintiff's injuries.

175.    The Johnson & Johnson Defendants' conduct, as described above, was extreme and outrageous. The Johnson & Johnson Defendants risked the lives of the consumers and users of their products, including Plaintiff, by having knowledge of the safety and efficacy problems associated with the PRODUCTS, but suppressing this knowledge from the general public.  The Johnson & Johnson Defendants made conscious decisions not to redesign, relabel, warn or inform the unsuspecting consuming public.  The Johnson & Johnson Defendants' outrageous conduct warrants an award of punitive damages.

176.    As a direct and proximate result of the Johnson & Johnson Defendants' implied warranties of fitness concerning the PRODUCTS, as described herein, Plaintiff suffered and continue to suffer from the injuries and damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs and attorneys' fees.

WHEREFORE, Plaintiff prays for judgment against the Johnson & Johnson Defendants in a fair a reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT XVI – CIVIL CONSPIRACY
### (Against All Defendants)

177.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

178.    At all relevant times, the Defendants and/or their predecessors-in-interest knowingly agreed, contrived, combined, confederated, and/or conspired to cause Plaintiff's injuries by exposing the Plaintiff to harmful and dangerous PRODUCTS.

179. Further, at all relevant times, the Defendants knowingly agreed, contrived, confederated, and/or conspired to defraud Plaintiff and consumers of the PRODUCTS regarding the true nature of the PRODUCTS and their potential to cause ovarian cancer when used in a reasonably foreseeable manner.

180. At all relevant times, the Defendants knowingly agreed, contrived, confederated, and/or conspired to defraud Plaintiff and consumers of the PRODUCTS with the purpose of maintaining the popularity and reputation of the PRODUCTS and therefore maintaining high PRODUCT sales, at the expense of consumer safety.

181. At all relevant times, pursuant to and in furtherance of said conspiracies, the Defendants performed the following overt and unlawful acts:

a. For many decades, upon information and belief, Defendants, individually, jointly, and in conspiracy with each other, have been in possession of medical and scientific data, literature, and test reports, which indicate that, when applied to the perineal area, an ordinary and foreseeable use by women, the PRODUCTS are unreasonably dangerous, hazardous, deleterious to human health, carcinogenic, and potentially deadly;

b. Upon information and belief, despite the medical and scientific data, literature, and test reports possessed by and available to the Defendants, Defendants individually, jointly, and in conspiracy with each other, fraudulently, willfully, and maliciously:

i. Withheld, concealed, and suppressed said medical information regarding the increased risk of ovarian cancer from consumers, including Plaintiff;

41

      ii.      The Defendants, through the TIPTF, instituted a "defense strategy" to defend talc at all costs. Admittedly, the Defendants, through the TIPTF, used their influence over the NTP Subcommittee, and the threat of litigation against the NTP to prevent the NTP from classifying talc as a carcinogen on its 10th RoC;

      iii.      Caused to be released, published, and disseminated medical and scientific data, literature, and test reports containing information and statements regarding the risks of ovarian cancer, which Defendants knew were incorrect, incomplete, and misleading.

      c.      Upon information and belief, by these false and fraudulent representations, omissions, and concealments, Defendants intended to induce consumers, including the Plaintiff, to rely upon said false and fraudulent representations, omissions, and concealments, and to continue to expose herself to the dangers inherent in the use of the PRODUCTS.

182.      Plaintiff reasonably relied upon the aforementioned fraudulent representations, omissions, and concealments made by the Defendants regarding the nature of the PRODUCTS.

183.      As a direct and proximate result of Defendants' overt unlawful acts regarding the nature of the PRODUCTS which were made pursuant to and in furtherance of a common scheme, and Plaintiff's reliance thereon, Plaintiff suffered and continues to suffer from the injuries and damages for which she is entitled to recovery, including but not limited to compensatory damages, consequential damages, interest, costs, and attorney fees.

WHEREFORE, Plaintiff prays for judgment against the Johnson & Johnson Defendants, Imerys Talc, and PCPC in a fair a reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT XVII – PUNITIVE DAMAGES
### (Against All Defendants)

184.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

185.    Plaintiff is entitled to punitive damages because Defendants' wrongful acts and/or omissions were attended by circumstances of fraud, malice, or willful and wanton conduct, and done heedlessly or recklessly, without regard to consequences or the rights and safety of others, particularly Plaintiff.  Such conduct includes, but is not limited to the following:

a.    At all relevant times, Defendants knew of the PRODUCTS' defective nature, as set forth herein, but continued to design, formulate, manufacture, market, and sell the PRODUCTS to maximize sales and profits at the expense of the health and safety of the consuming public, including Plaintiff, and in conscious disregard of the foreseeable harm caused by the PRODUCTS;

b.    At all relevant times, despite their knowledge of the risk of ovarian cancer associated with the PRODUCTS, Defendants failed to disclose this risk through marketing and promotional efforts and product labeling;

c.    At all relevant times, Defendants continued to promote the PRODUCTS as safe for perineal use and failed to provide adequate warnings regarding the risk of developing ovarian cancer if using the PRODUCTS in the perineal area;

d.    At all relevant times, Defendants had knowledge of safer alternative designs for the PRODUCTS and failed to substitute such safer design.

WHEREFORE, Plaintiff prays for judgment against the Johnson & Johnson Defendants, Imerys Talc, and PCPC in a fair a reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## ACCRUAL OF THE CAUSES OF ACTION

186.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

187.    Plaintiff had no knowledge of the cause in fact of her injury nor did she have any evidence of wrongdoing on the part of Defendants until April 2015.

189.    Additionally, Defendants acts of fraudulent concealment alleged herein operated to equitably toll the applicable statute of limitations.

## DAMAGES AND PRAYER FOR RELIEF

190.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

191.    WHEREFORE, Plaintiff seeks judgment in her favor against the Defendants as follows:

  a.  Severe impairment to her ovaries and reproductive system;

  b.  Medical expenses;

  c.  Pain and suffering;

  d.  Mental anguish, anxiety, and discomfort;

  e.  Lost wages and income;

  f.  Fear of cancer or other related diseases;

  g.  Physical impairment;

  h.  Physical disfigurement;

i.      Loss of enjoyment of life;

j.      Loss of consortium;

k.      Pre and post judgment interest;

l.      Exemplary and punitive damages in an amount to be determined at trial;

m.      Treble damages;

n.      General damages;

o.      Reasonable and necessary attorneys' fees and other disbursements and expenses of this action;

p.      Such other relief to which Plaintiff may be justly entitled; and

q.      Any and all other damages to be shown at trial.

WHEREFORE, Plaintiff, Gwendolyn Sobotker, prays for judgment against the Defendants, individually and collectively, in a fair a reasonable sum in excess of $75,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

RESPECTFULLY SUBMITTED,


ASHCRAFT & GEREL, LLP

BY:     /s/ Michelle A. Parfitt
        Michelle A. Parfitt (D.C. Bar No. 358592)
        James F. Green (D.C. Bar No. 214965)
        4900 Seminary Rd., Ste. 650
        Alexandria, VA 22311
        (703) 931-5500
        mparfitt@ashcraftlaw.com
        jgreen@ashcraftlaw.com


BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, PC

BY:   /s/ P. Leigh O'Dell
P. Leigh O'Dell
Post Office Box 4160
Montgomery, Alabama 36103
(334) 269-2343
leigh.odell@beasleyallen.com

## JURY DEMAND

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES.**

/s/ Michelle A. Parfitt
Michelle A. Parfitt (D.C. Bar No. 358592)
James F. Green (D.C. Bar No. 214965)
4900 Seminary Rd., Ste. 650
Alexandria, VA 22311
(703) 931-5500
mparfitt@ashcraftlaw.com
jgreen@ashcraftlaw.com